FILED
U.S. DIST. COURT
MIDDLE DIST. OF LA.
SEP 17 PM 3:55

RICHARD MARTIN
CLERK

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

CASE NO.: 98-802-C-3

The State of Louisiana, Louisiana Organ )
Procurement Agency, Louisiana State University )
School of Medicine at Shreveport, through the )
Board of Supervisors of the Louisiana State )
University and Agricultural & Mechanical College, )
Louisiana State University School of Medicine at )
New Orleans through the Board of Supervisors of )
the Louisiana State University and Agricultural & )
Mechanical College, Alton Ochsner Medical )
Foundation d/b/a Ochsner Foundation Hospital, )
Ochsner Clinic, University Healthcare System, LLC )
d/b/a Tulane University Hospital and Clinic, Board )
of Administrators of the Tulane Educational Fund )
d/b/a Tulane University School of Medicine, )
Willis-Knighton Medical Center, and Memorial )
Medical Center )
)
                              Plaintiffs,                )          COMPLAINT
)
vs.                                                      )
)
Donna E. Shalala, in her capacity as the      )
Secretary of the United States Department    )
of Health and Human Services,                     )
)
                              Defendant.                 )
_____ )

NOW INTO COURT, through undersigned counsel, come plaintiffs, the State of

Louisiana, Louisiana Organ Procurement Agency, Louisiana State University School of Medicine

at Shreveport, through the Board of Supervisors of the Louisiana State University and

Agricultural & Mechanical College, Louisiana State University School of Medicine at New

Orleans, through the Board of Supervisors of the Louisiana State University and Agricultural &

Mechanical College, Alton Ochsner Medical Foundation d/b/a Ochsner Foundation Hospital,



Ochsner Clinic, University Healthcare System, LLC d/b/a Tulane University Hospital and Clinic, Board of Administrators of the Tulane Educational Fund d/b/a Tulane University Medical Center, Willis-Knighton Medical Center and Memorial Medical Center to seek judicial review of a Final Rule governing the Organ Procurement and Transplantation Network promulgated by the Department of Health and Human Services; and aver as follows:

## A.     THE PARTIES

**PLAINTIFFS:**

1.    The State of Louisiana, through Attorney General Richard P. Ieyoub.

2.    Louisiana Organ Procurement Agency (LOPA), a non-profit corporation organized and existing under the laws of the State of Louisiana with its principal place of business in Metairie, Louisiana, acting on its own behalf and on behalf of all those persons who are members of the Louisiana Donor Registry and who will be irreparably harmed by the Final Rule.

3.    Louisiana State University School of Medicine at Shreveport, through the Board of Supervisors of the Louisiana State University and Agricultural & Mechanical College, acting on its own behalf and on behalf of its individual patients who are waiting for organ transplants and will be irreparably harmed by the Final Rule.

4.    Louisiana State University School of Medicine at New Orleans, through the Board of Supervisors of the Louisiana State University and Agricultural & Mechanical College, acting on its own behalf and on behalf of its individual patients who are waiting for organ transplants and will be irreparably harmed by the Final Rule.

5.    Alton Ochsner Medical Foundation d/b/a Ochsner Foundation Hospital, a non-profit corporation organized and existing under the laws of Louisiana with its principal place of business

in Jefferson, Louisiana, acting on its own behalf and on behalf of its individual patients who are waiting for organ transplants and will be irreparably harmed by the Final Rule.

6.      Ochsner Clinic, a general partnership organized and existing under the laws of Louisiana with its principal place of business in Jefferson, Louisiana, acting on its own behalf, on behalf of its physician employees, and on behalf of its individual patients who are waiting for organ transplants and will be irreparably harmed by the Final Rule.

7.      University Healthcare System, LLC d/b/a Tulane University Hospital and Clinic, a limited liability company organized and existing under the laws of Louisiana with its principal place of business in New Orleans, Louisiana, acting on its own behalf and on behalf of its individual patients who are waiting for organ transplants and will be irreparably harmed by the Final Rule.

8.      The Board of Administrators of the Tulane Educational Fund, d/b/a Tulane University School of Medicine, a non-profit corporation organized and existing under the laws of Louisiana with its principal place of business in New Orleans, Louisiana, acting on its own behalf, on behalf of its physician employees, and on behalf of its individual patients who are waiting for organ transplants and will be irreparably harmed by the Final Rule.

9.      Willis-Knighton Medical Center, a non-profit corporation organized and existing under the laws of Louisiana with its principal place of business in Shreveport, Louisiana, acting on its own behalf,  and on behalf of its individual patients who are waiting for organ transplants and will be irreparably harmed by the Final Rule.

10.      Memorial Medical Center, a for-profit corporation organized and existing under the laws of Louisiana with its principal place of business in New Orleans, Louisiana, acting on its

3

own behalf, and on behalf of its individual patients who are waiting for organ transplants and will

be irreparably harmed by the Final Rule.

**DEFENDANT:**

11.     Donna E. Shalala is the Secretary of the United States Department of Health and

Human Services (DHHS), the government agency that promulgated the Final Rule.

### B.     NATURE OF THE ACTION, JURISDICTION, AND VENUE

12.     This is a civil complaint for judicial review of final agency action promulgating a

Final Rule to govern the operation of the Organ Procurement and Transplantation Network

(OPTN).

13.     This action seeks injunctive and declaratory relief.  Plaintiffs do not seek monetary

damages.

14.     Plaintiffs have exhausted their administrative remedies, there is no other adequate

remedy for redress of the grievances set out herein save this Court's review and the relief sought

by this complaint, and all conditions precedent to the maintenance of this suit have been met.

15.     This action arises under the National Organ Transplant Act (the Act), 42 U.S.C. §

273, et seq.; the Administrative Procedure Act, 5 U.S.C. § 551 , et seq.; the Louisiana Anatomical

Gift Act, LSA-R.S. 17:2351 et seq.; and the Constitution of the United States of America.  The

Court has original jurisdiction over the subject matter of this action under:

        a.     28 U.S.C. §  1331(a) (federal question); and

        b.     5 U.S.C. §§ 701-706 (Administrative Procedure Act).

16.     Declaratory relief is authorized under 28 U.S.C. §§  2201 and 2202.

17.     Venue in this district is proper under 28 U.S.C. § 1391(e).

## C.    **GENERAL ALLEGATIONS**

**The National Organ Transplant Act - 1984**

18.        In 1984, Congress passed the National Organ Transplant Act.  Pub. L. No. 98-507, 98 Stat. 2339 (codified as amended at 42 U.S.C. §§ 273-274 (1991)).

19.        When Congress passed the Act, the number of patients waiting for an organ transplant far surpassed the number of available organs.  Congress found that organ transplants were unavailable to most persons because of the shortage of donated organs, the enormous cost involved, and the small number of medical centers equipped to carry out organ transplants. S. Rep. No. 382, 98th Cong., 2d Sess. 2-3 (1984), reprinted in 1984 U.S.C.C.A.N. 3976-77.

20.        Congress sought to remedy this problem. A central purpose of the Act was to create a system "so that individuals throughout our country can have access to organ transplantation when appropriate and necessary." 1984 U.S.C.C.A.N. at 3979.

21.        Congress explicitly recognized that the organ procurement and transplantation system existing at the time was "a mixture of private sector initiatives and governmental involvement on both the state and federal levels."  For instance, all 50 states and the District of Columbia had individually adopted the Uniform Anatomical Gift Act to encourage organ donation among their citizens. 1984 U.S.C.C.A.N. at 3977-78. Louisiana passed the UAGA in 1968.

22.        Congress did not intend for the Act to intrude upon matters traditionally and exclusively subject to state regulation, such as laws on improper or unconsented use of organs, the definition of death, autopsy, burial, and the disposition of human remains. 1984 U.S.C.C.A.N. at 3982-83.

23.    Congress sought to assist the private sector and make its efforts more efficient. Congress stated that responsibility for organ procurement and allocation should lie "in the private sector rather than in government." 1984 U.S.C.C.A.N. at 3981.

24.    The Bill Summary in the Senate Report explicitly stated that the Act "provides that the Secretary shall assure the establishment and operation in the private sector of an organ procurement and transplantation network." 1984 U.S.C.C.A.N. at 3976.

25.    The Act provided for grants for the planning, establishment, initial operation, and expansion of "qualified organ procurement organizations." 42 U.S.C. § 273(a)(1)-(2).

26.    The Act required organ procurement organizations (OPOs) to arrange with hospitals and other health care entities in their service areas to identify all potential organ donors, and to make efforts to acquire all usable organs from potential donors.  42 U.S.C. § 273(b)(3)(A)-(B).

27.    The Act also required OPOs to have a geographic service area large enough to include at least fifty potential donors.  Pub. L. No. 98-507, § 371, 98 Stat. 2343 (1984) (amended 1988 and 1990).

28.    Finally, the Act required OPOs to "have a system to allocate donated organs equitably among transplant patients according to established medical criteria." 42 U.S.C. § 273(b)(3)(E).

29.    The Act also directed the Secretary of Health and Human Services to contract with a private nonprofit entity with an expertise in organ procurement and transplantation to establish and operate an Organ Procurement and Transplantation Network (OPTN).  42 U.S.C. § 274(a) & (b)(1)(A)).

30.    The Act specified that the OPTN have a board of directors that included representatives of organ procurement organizations, transplant centers, voluntary health associations, and the public.  42 U.S.C. § 274(b)(1)(B).

31.    The Act required the OPTN to establish a national list of individuals who need organs, and a national system "in accordance with established medical criteria" to match organs and individuals on the list.  42 U.S.C. § 274(b)(2)(A)(i)-(ii).

32.    The Act directed the OPTN "to assist organ procurement organizations (OPOs)  in the distribution of organs which cannot be placed within the service area of the organ procurement organization." 42 U.S.C. § 274(b)(2)(A)(i)-(ii).

33.    The Act did not grant the Secretary any authority over organ allocation decisions.

**The Omnibus Budget Reconciliation Act - 1986**

34.    In 1986, Congress amended the Social Security Act to insert Section 1138, which requires OPOs and hospitals to abide by OPTN policies as a prerequisite for Medicare and Medicaid reimbursement. Pub. L. No. 99-509, § 9318, 100 Stat 2009 (codified at 42 U.S.C. § 1320b-8 (1991)).

35.    Section 1138 specifically provides that an OPO may participate in Medicare and Medicaid if it "is a member of, and abides by the rules and requirements of, the Network (OPTN)" and  "allocates organs, within its service area and nationally, in accordance with medical criteria and the policies of the Network (OPTN)." 42 U.S.C. § 1320b-8.

**The National Organ Transplant Act Amendments - 1988**

36.    In light of the addition of Section 1138 to the Social Security Act, Congress amended the National Organ Transplant Act in 1988.  Pub. L. No. 100-607, 102 Stat. 3114 (codified as amended at 42 U.S.C. § § 273-274 (1991)).

37.    Congress recognized the critical role played by the OPTN in organ allocation decisions, as well as the hardship a hospital or OPO would suffer if it were ineligible to participate in Medicare or Medicaid because of its non-conformity with OPTN policies.  Therefore, Congress required the OPTN to establish a public comment and hearing process similar to those required of government agencies for review of its membership and organ allocation criteria.  S. Rep. No. 310, 100th Cong., 2d Sess. 13 (1988), reprinted in 1988 U.S.C.C.A.N. 4236, 4241.

38.    The 1988 Amendments required the OPTN, not the Secretary, to establish "membership criteria and medical criteria for allocating organs and provide to members of the public an opportunity to comment with respect to such criteria."   42 U.S.C. § 403(a)(1)(B).

39.    The original Act directed the OPTN to assist OPOs in the distribution of organs "which cannot be placed within the service area of the organ procurement organization."  The 1988 Amendments modified this section to alleviate any "statutory bias" regarding the local placement of organs. 1988 U.S.C.C.A.N. at 4241-42.

40.    This amendment was intended to ensure that the Act would not be read to establish "a preference for, or against, distribution within the service area of the organ procurement organization." 1988 U.S.C.C.A.N. at 4242.

41.    Congress reaffirmed that the OPTN maintained sole authority to "resolve any issues regarding the fair and effective distribution of organs." 1988 U.S.C.C.A.N. at 4242.

42.     The 1988 Amendments also revised the OPO geographic service area requirement "to be large enough that it is reasonable to expect the agency to procure organs from at least fifty donors." Congress noted that this amendment might require OPOs to expand their service area. 1988 U.S.C.C.A.N. at 4240.

43.     Finally, the 1988 Amendments clarified that "the OPO is responsible for allocating organs equitably among the patients who are in need of a transplant." 1988 U.S.C.C.A.N. at 4240.

**The National Organ Transplant Act Amendments - 1990**

44.     Congress amended the Act again in 1990. Pub. L. No. 101-616, 104 Stat. 3279 (1990)(codified at 42 U.S.C. § § 273-274). The amendment directed the OPTN to "assist organ procurement organizations in the nationwide distribution of organs equitably among transplant patients." 42 U.S.C. § 273(b)(1)(E).

45.     Congress reiterated that "the OPTN . . . is charged with setting much of national transplant policy" and "[t]he OPTN Board of Directors makes policy decisions on such matters as assuring that the organ allocation system is fair and equitable." S. Rep. No. 530, 101st Cong., 2nd Sess. 19-20 (1990), reprinted in 1990 U.S.C.C.A.N. 4625, 4639.

46.     The 1990 Amendments further refined OPO service areas, requiring the Secretary to "establish performance standards by regulation to assure that an OPO has a defined service area that is of sufficient size to assure maximum effectiveness in the procurement and equitable distribution of organs." 42 U.S.C. § 273(b)(1)(E).

**The OPTN's Establishment of Organ Allocation Policy**

47.    In 1986, DHHS contracted with the United Network for Organ Sharing (UNOS), with headquarters in Richmond, Virginia, to establish and operate the OPTN.  The contract was competitively renewed for three years in September 1990, 1993, and most recently in December 1996.

48.    UNOS's membership includes every transplant center, organ procurement organization, and tissue typing laboratory in the United States, as well as 29 medical or scientific organizations, 12 voluntary health organizations, and 9 general public members.

49.    As a practical matter, the UNOS membership is the OPTN.

50.    UNOS has a 40-member Board of Directors that includes donor families, transplant candidates and recipients, organ recovery professionals, histocompatibility specialists, representatives of voluntary health organizations, and experts in the fields of medicine, ethics, religion, law, social and behavioral sciences, research, and health care financing.

51.    UNOS adopts organ allocation policies only after hearing and considering the views of the public, UNOS members, the federal government, and interested individuals in the health care community.  UNOS modifies policies in a timely manner to reflect current science.

52.    UNOS's organ allocation policies balance the following principles: (1) Enhancing the overall availability of transplantable organs; (2) Allocating organs based on medical criteria, with equal consideration given to medical utility and equity; (3) Providing transplant candidates reasonable opportunities to be considered for an organ within comparable time periods; and (4) Respecting individual autonomy.

53.    For transplantation purposes, UNOS divides the United States into 11 regions. Each region has representatives on the UNOS Board of Directors and on each of UNOS's permanent standing committees.

54.    UNOS divides the United States into regions because regionalization helps to reduce organ preservation time, improve organ quality and survival outcomes, reduce the costs incurred by the transplant patient, and increase access to transplantation.

55.    UNOS liver allocation policy states that donated organs are first offered to UNOS members for allocation to local patients (within the OPO service area), then to patients in the region, and then to patients nationally.

56.    Within each geographic area -- local, regional, and national -- patients are ranked in descending point order, with the patient having the highest number of points receiving the highest priority.  UNOS considers numerous factors to calculate a patient's point total, including the patient's blood type and the time he has been on the waiting list for an organ.

57.    UNOS also assigns each patient a status code based on how medically urgent it is that the patient receive a transplant, with Status 1 patients having the highest priority, followed by Status 2A, 2B, 3, and 7.

58.    When, for example, a liver becomes available, it is offered first to Status 1 patients in the OPO service area where the organ was procured, then to local Status 2A, 2B, or 3 patients. If there is no suitable recipient locally, the organ is offered regionally first to Status 1 patients and so on.  If there is no suitable recipient regionally, the organ is offered nationally in the same order of patient priority.

59.     The overwhelming majority of transplant centers, OPOs, and other members of the transplant community support UNOS's organ allocation policies.

**Louisiana's Organ Donation, Procurement, Allocation, and Transplantation Efforts**

60.     The State of Louisiana, in partnership with LOPA, the Louisiana transplant centers, and its own citizens, has attempted to make organ transplantation available to all patients in Louisiana hospitals, regardless of socioeconomic status.

61.     The State of Louisiana has enacted a comprehensive body of law that governs organ donation, procurement, allocation, and transplantation. LSA-R.S. 17:2351; LSA-R.S. 32:410; LSA-R.S. 40:1299.121.

62.     Louisiana law states that if an anatomical gift is made in Louisiana of any vascular organ for transplantation purposes, if the donor does not name a specific donee and the organ is deemed suitable for transplantation to an individual, the vascular organ shall be donated to the Louisiana-designated organ procurement organization. LSA-R.S. 17:2353.B(1).

63.     Louisiana law further provides that the Louisiana-designated organ procurement organization "shall use its best efforts to determine if there is a suitable recipient in the state." LSA-R.S. 17:2353.B(1).

64.     Louisiana law further provides that the Louisiana-designated organ procurement organization "may only transfer a vascular organ to an out-of-state organ procurement organization or suitable out-of-state recipient for transplantation if either: (a) a suitable recipient in the state of Louisiana is not found in a reasonable amount of time; or (b) the Louisiana-designated organ procurement organization has a reciprocal agreement with an out-of-state procurement organization." LSA-R.S. 17:2353.B(2)(a).

65.     Louisiana has one statewide OPO (LOPA), and Louisiana law on organ allocation is consistent with existing UNOS policies.

66.     LOPA is the Louisiana-designated organ procurement organization.  LSA-R.S. 17:2354.4(J).  The State of Louisiana has charged LOPA with implementing the State's will regarding organ donation, procurement, and allocation.

67.     LOPA provides a full range of services to assist hospitals and patient families in the donation process, and to ensure the equitable distribution of organs for transplant.

68.     LOPA has exceeded the national average for donations per million people for five of the last six years.  Last year, LOPA also exceeded the national average for organs recovered and used in transplantation. Over 419,000 Louisiana citizens are members of the Louisiana Donor Registry, and have agreed to donate their organs in accordance with Louisiana law upon death.

69.     Louisiana's efforts have benefited patients across the Nation.  In its 10-year history, LOPA has shipped approximately one-third of its recovered organs to transplant centers outside Louisiana.

70.     The Louisiana transplant centers exceed the national average for transplantation of African-American and other minority patients.  In 1996, minorities comprised over 60% of kidney recipients at Louisiana transplant centers, compared to a national average of 44.5%.  Likewise, Louisiana transplant centers performed more liver transplants on minorities than the national average.

71.     Because  of the efforts of Louisiana and LOPA, and the generosity of Louisiana donors, Louisiana patients waiting for a liver transplant have a shorter waiting time than the national average.

**The Notice of Proposed Rulemaking - 1994**

72.     On September 8, 1994, the Public Health Service of the Department of Health and Human Services published in the Federal Register a Notice of Proposed Rulemaking governing the operation of the Organ Procurement and Transplantation Network.  59 Fed. Reg. 46,482 (1994).

73.     The Notice allowed for public comment on the proposed rule until December 7, 1994.  DHHS extended this date to December 13, 1996.  61 Fed. Reg. 58,158 (1996).

74.     Consistent with the Act's language, as well as the practice since the Act's passage, the proposed rule recognized that the OPTN has exclusive statutory authority to develop organ allocation policy.  It stated: "The OPTN Board of Directors shall be responsible for developing, with the advice of the OPTN membership and other interested parties . . . medical criteria and related policies for the fair and equitable allocation of human donor organs."  59 Fed. Reg. 46,496-97.

75.     The Secretary's role under the Proposed Rule was to oversee "the processes by which the OPTN allocates organs for transplantation" and to "ensure that those processes are fair and equitable and provide for public participation."  59 Fed. Reg.  46483.

76.     DHHS never adopted the proposed rule.

**The Final Rule - April 2, 1998**

77.     On April 2, 1998, the Health Resources and Services Administration of the Department of Health and Human Services published in the Federal Register a Final Rule governing the operation of the Organ Procurement and Transplantation Network. 63 Fed. Reg. 16,296 (1998) (to be codified at 42 C.F.R. pt. 121).

78.    The Final Rule bears no resemblance to the September 1994 Proposed Rule.  It is tantamount to a new rule designed and implemented without notice to, or an opportunity for, prior comment from the general public and the transplant community.

79.    The Final Rule, which states that "OPO areas should not be the primary vehicle for organ allocation," abandons the Act's stated requirement that individual OPOs shall, with the OPTN's assistance, make organ allocation decisions.  63 Fed. Reg. 16312.

80.    The Final Rule mandates that the OPTN develop new "organ-specific policies" that group transplant candidates by "status categories ordered from most to least medically urgent." 63 Fed. Reg. 16,335.

81.    The Final Rule also mandates that the "organ-specific policies" shall be designed and implemented "to allocate organs among transplant candidates in order of decreasing medical urgency status, with waiting time in status used to break ties within status groups.  Neither place of residence nor place of listing shall be a major determinant of access to a transplant." 63 Fed. Reg. 16,335.

82.    This new organ allocation policy essentially mandates a single national list of patients with priority to the "sickest patients first."

83.    Unlike the Proposed Rule, the Final Rule vests ultimate control of organ allocation policy with the Secretary instead of the OPTN.  The Final Rule states that the OPTN may develop policies "that reflect the Secretary's policies, as expressed in this regulation."  If the Secretary is dissatisfied with the OPTN's policies, she may "direct the OPTN to adopt a policy, or may develop a policy that the OPTN must follow." 63 Fed. Reg. 16,334.

84.     The Final Rule also purports to preempt Louisiana's laws on organ donation, procurement, and allocation. 63 Fed. Reg. 16,338 (to be codified at 42 C.F.R. pt. 121.12).

85.     DHHS admits in the Act's preamble that, compared to the existing policy, the organ allocation scheme mandated by the Final Rule will "reduce the number of individuals transplanted" and cause "survival rates [to] decrease" among those transplanted. 63 Fed. Reg. 16,327.

86.     An overwhelming majority of leading experts within the transplant community have emphatically condemned the Final Rule. For example, the American Society of Transplant Surgeons has stated that the Final Rule "would be wasteful and dangerous, resulting in fewer patients transplanted, increased death rates, increased re-transplantation due to poor organ function, and increased overall costs of transplantation."

87.     The Final Rule stated that it would take effect on July 1, 1998. Although the Final Rule was already "final," it stated that DHHS would accept *ex post facto* comments until June 1, 1998.

88.     On May 1, 1998, Congress passed the Supplemental Appropriations Act. One of the Act's provisions extended the period for submitting *ex post facto* comments on the Final Rule until August 31, 1998, and the effective date of the Final Rule until not before October 1, 1998. Pub. L. No. 105-174, § 4002, 112 Stat. 88 (1998).

89.     On July 1, 1998, DHHS published in the Federal Register an "Extension of Comment Period and Delay of Effective Date for the Organ Procurement and Transplantation Network." This document complied with the Supplemental Appropriations Act by amending the

16

Final Rule's comment period to August 31, 1998.  The document also stated that October 1, 1998, is the Final Rule's new effective date.  63 Fed. Reg. 35,847 (1998).

90.    The Final Rule commandeers LOPA and the Louisiana transplant centers into the service of an unconstitutional and unauthorized federal regulatory scheme.

91.    The Final Rule constitutes an attempt to coerce Louisiana, LOPA, and the Louisiana transplant centers into defying Louisiana law by threatening the withholding of all Medicare and Medicaid reimbursement for organ procurement and transplantation unless they adhere to the Final Rule's new allocation scheme.

92.    One or more of the plaintiffs timely filed comments in response to the Final Rule.

93.    Unless this Court grants the relief requested by plaintiffs, the Final Rule will take effect on October 1, 1998.

94.    In the respects specifically set forth below, the Final Rule is arbitrary, capricious, ultra vires, contrary to law, unsupported by the rulemaking record, without any rational basis, and in violation of the laws and Constitution of the United States of America.

95.    The Final Rule will cause immediate and irreparable harm to plaintiffs, and those on whose behalf they sue, as follows:

  a.    The Final Rule unconstitutionally impinges on the sovereignty of the State of Louisiana;

  b.    The Final Rule requires LOPA to violate Louisiana's laws on organ allocation;

c.    The Final Rule will re-allocate organs out of the state of Louisiana, and, for that reason, the Louisiana transplant centers will be unable to perform potentially life-saving organ transplants;

d.    The Final Rule will cause most Louisiana patients to have to wait much longer -- until they are among the sickest patients in the country -- before having a chance to receive an organ transplant, thus decreasing their chances for survival;

e.    The Final Rule violates every Louisiana registered donor's fundamental and constitutionally-protected right to make his or her own personal and autonomous decision as to how to dispose of his or her remains after death;

f.    If LOPA and the Louisiana transplant centers do not immediately comply with the regulations, they are subject to forfeiture of all Medicare and Medicaid funding. Such forfeiture would have a disastrous effect on the citizens of Louisiana who are dependent on this funding for their health care needs;

g.    Likewise, the state of Louisiana will have to revoke its existing laws on organ allocation, or be subject to forfeiture of all Medicare and Medicaid funding.

h.      Because time is of the essence in organ procurement,

allocation, and transplantation, any confusion as to which rules to

apply (Louisiana law or the Final Rule) may lead to organ wastage

or, even worse, loss of life for potential organ recipients.

96.    This matter is ripe for judicial review.

### D.    SPECIFIC COUNTS

### National Organ Transplant Act Violations:

### COUNT I

97.    Plaintiffs reallege the allegations set out in Paragraphs 1 through 96.

98.    In the Act, Congress gave OPOs and the OPTN, not the Secretary, the

authority to create organ allocation policy.  The Act states that each OPO shall "have a system to

allocate donated organs equitably among transplant patients" and the OPTN shall "establish

membership criteria and medical criteria for allocating organs" and "assist OPOs in the nationwide

distribution of organs equitably among transplant patients."  42 U.S.C. § § 273-274.

99.    In the Final Rule, DHHS unlawfully strips the OPTN of its statutory authority

to create organ allocation policy, and transfers ultimate policy-making authority to the Secretary.

100.    The plain language of the Act clearly demonstrates that DHHS does not have

the statutory authority to promulgate the organ allocation provisions in the Final Rule. Therefore,

the Final Rule is *ultra vires* and violates the Act.  Chevron U.S.A., Inc. v. Natural Resources

Defense Council, Inc., 467 U.S. 837 (1984).

## COUNT II

101.      Plaintiffs reallege the allegations set out in Paragraphs 1 through 100.

102.      The Final Rule purports to preempt state law: "No State or local governing entity shall establish or continue in effect any law, rule, regulation, or other requirement that would restrict in any way the ability of any transplant hospital, OPO, or other party to comply with organ allocation policies of the OPTN or other policies of the OPTN that have been approved by the Secretary under this Part." 63 Fed. Reg. 16,338 (to be codified at 42 C.F.R. pt. 121.12).

103.      The Act endeavored to encourage, not hinder, state and private initiatives towards organ donation, procurement, allocation, and transplantation. Congress stated that responsibility for organ procurement and allocation should lie "in the private sector rather than in government." 1984 U.S.C.C.A.N. at 3981.

104.      The Act does not grant DHHS the authority to preempt Louisiana law. Therefore, the Final Rule is *ultra vires* and violates the Act. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).

### Administrative Procedure Act (APA) Violations:

## COUNT III

105.      Plaintiffs reallege the allegations set out in Paragraphs 1 through 104.

106.      The Final Rule bears no resemblance to the Notice of Proposed Rulemaking published in the Federal Register in 1994, which deferred to the OPTN on organ allocation policy. The Final Rule mandates a specific new organ allocation policy.

107.    The Final Rule is not a "logical outgrowth" of the proposed rule on which the Secretary solicited comments.

108.    DHHS did not allow interested persons to submit written comments containing data, views, or arguments on the new organ allocation policy until after it had issued the Final Rule.

109.    DHHS did not meaningfully consider the public comments filed in opposition to the Final Rule, nor did it issue with the Final Rule a concise general statement of basis and purpose that addressed the opposition to the Final Rule's new organ allocation policy. Therefore, the Final Rule violates the APA's procedural requirements.  5 U.S.C. § 553(b) & (c); 5 U.S.C. § 706.

## COUNT IV

110.    Plaintiffs reallege the allegations set out in Paragraphs 1 through 109.

111.    The comments in the record indicate, and the Secretary has admitted, that the Final Rule's new organ allocation scheme will decrease the number of transplants performed and transplant survival rates.

112.    The new organ allocation scheme will also undermine the "split-liver technique."  This is a new medical technique where a single recovered liver is divided and transplanted in two patients.  Once perfected, it has the potential to double the numbers of organs available, and thus the number of transplants performed.

113.    Furthermore, the new organ allocation scheme will significantly increase transplantation costs.  It will adversely impact small and medium-sized transplant centers, which in turn will impinge on patient access to transplantation.

114.    DHHS premises the new organ allocation scheme on its desire to equalize waiting times nationwide. But equal waiting times is an inappropriate factor on which to base organ allocation policy because, as DHHS acknowledged in the Final Rule, "current measures of waiting time disparities are weak because the lack of listing standards does not create uniform, status-related measures." In short, "equal waiting times" is an artificial measure of medical urgency or equity.

115.    DHHS has failed to meaningfully consider the relevant factors and has considered the wrong factors.  DHHS's explanation for its decision runs counter to the evidence before the agency and is so implausible that it cannot be ascribed to a difference in view or the product of agency expertise.  The Final Rule is not a product of reasoned decisionmaking. Therefore, the Final Rule is arbitrary, capricious, contrary to the express terms of the Act, unsupported by the rulemaking record, and without any rational basis.  5 U.S.C. § 706.

**Constitutional Violations:**

## COUNT V

116.    Plaintiffs reallege the allegations set out in Paragraphs 1 through 115.

117.    The Final Rule purports to preempt Louisiana law on organ donation, procurement, allocation, and transplantation.  The regulation of issues of death and dying, including donation and procurement of cadaveric organs, is a matter traditionally reserved to the states under the Constitution of the United States of America.

118.    The Final Rule intrudes on matters that are properly the province of the individual states, and therefore the Rule violates the Tenth Amendment to the Constitution of the United States of America.

## COUNT VI

119.     Plaintiffs reallege the allegations set out in Paragraphs 1 through 118.

120.     The Final Rule unconstitutionally seeks to commandeer LOPA and the Louisiana transplant centers into the service of a federal regulatory scheme, in violation of the Tenth Amendment to Constitution of the United States of America and the United States Supreme Court's holding in Printz v. U.S., 117 S.Ct. 2365 (1997).

## COUNT VII

121.     Plaintiffs reallege the allegations set out in Paragraphs 1 through 120.

122.     LOPA brings this action on its own behalf, and on behalf of the thousands of members of the Louisiana Donor Registry who have agreed to make an anatomical gift of their organs after death in accordance with Louisiana law.  The Final Rule renders these decisions, and any future attempts to donate in accordance with Louisiana law, null.

123.     The Final Rule impinges on the fundamental right of donors to make their own decisions as to how to dispose of their remains after death, and thus violates the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

### E.     PRAYER FOR RELIEF

Plaintiffs pray for the following relief:

1.  A stay of enforcement of the Final Rule, pursuant to 5 U.S.C. § 705, pending a trial on
    the merits of this Complaint;

2.  A final order and judgment setting aside the Final Rule and permanently enjoining the Final Rule's enforcement;

3.  Attorneys' fees and costs in accordance with law; and

4.  Such additional relief as the Court may deem appropriate under the law and facts in this case.

RESPECTFULLY SUBMITTED:

Richard P. Ieyoub
Attorney General

Roy A. Mongrue Jr., T.A. (Bar No. 9549)
Assistant Attorney General
Charles H. Braud Jr. (Bar No. 3409)
Assistant Attorney General

Department of Justice
State of Louisiana
Office of the Attorney General
339 Florida Street, Suite 500
Baton Rouge, Louisiana 70801
Baton Rouge: (225) 342-2465
New Orleans: (504) 599-1149
Fax: (225) 342-2090

Attorneys for the State of Louisiana

Gene W. Lafitte, T.A. (Bar No. 8091) · JL
Shaun G. Clarke (Bar No. 24054)
E. Peter Urbanowicz (Bar No. 19817) — JL
Lance P. Martin (Bar No. 23852) — JL   9/18/98
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, LA 70139-5099
Tel:  (504) 581-7979
Fax:  (504) 556-4108

Attorneys for the Louisiana Organ
Procurement Agency, Louisiana State University
School of Medicine at Shreveport, through the
Board of Supervisors of the Louisiana State
University and Agricultural & Mechanical
College, Louisiana State University School of
Medicine at New Orleans through the Board of
Supervisors of the Louisiana State University and
Agricultural & Mechanical College, Alton Ochsner
Medical Foundation d/b/a Ochsner Foundation
Hospital, Ochsner Clinic, University Healthcare
System, LLC d/b/a Tulane University
Hospital and Clinic, Board of Administrators of
the Tulane Educational Fund d/b/a Tulane
University School of Medicine, Willis-Knighton
Medical Center, and Memorial Medical Center

DRAFT
Not In Final Form

## EXHIBIT "A"

## COOPERATIVE ENDEAVOR AGREEMENT BETWEEN
## THE STATE OF LOUISIANA and
## THE PARISH OF IBERVILLE
**FP&C Project No. 50-J24-98-2**
*Parish Health Unit Land/Building Acquisition,*
*Planning and Construction*
*(Iberville)*

**COSTS AND FUNDS THIS AGREEMENT ($) :**

| COST CATEGORIES | CAPITAL OUTLAY CASH[1] | NON-CASH LINE OF CREDIT | OTHER | TOTAL |
|---|---|---|---|---|
| LAND | _____ | _____ | _____ | _____ |
| PLANNING | _____ | _____ | _____ | _____ |
| CONSTRUCTION | _____ | _____ | _____ | _____ |
| MISC. | _____ | _____ | _____ | _____ |
| EQUIPMENT | _____ | _____ | _____ | _____ |
| FP&C ADMIN. | 2,500 | _____ | _____ | 2,500 |
| TOTAL COSTS AND FUNDS | _____ | _____ | _____ | _____ |

Planning Costs shall not exceed 10% of Construction Costs.  Miscellaneous Costs shall not exceed 5% of Construction Costs.  Equipment Costs shall not exceed actual costs of major equipment needed to initiate the operation of the facility and as approved by FP&C.  FP&C Administrative Costs shall be fixed based on the estimated number of hours, or fractions thereof, to be spent by FP&C on the Project, but in no event to exceed 6% of the total of state funds.  The allowable costs stated in the Agreement shall not exceed these amounts.

-9-

1 Cash includes General Funds, NRP Bonds, Cash Line of Credit and/or Bonds sold.